JEHU H. CLENDANIEL *vs.* HENRY C. CONRAD, Associate Judge Resident in Sussex County, THOMAS COLEMAN DU PONT, LEWIS L. DUNHAM, Frank M. WILLIAMS, SIDNEY H. HENRY and PAUL E. WILSON.

1. STATUTES—CONSTRUCTION—EXTRINSIC AIDS.

In a proper case, reference may be had to the message of the Governor, and other matters constituting a part of the legislative record, in connection with a bill, to aid the court in ascertaining its real object.

2. STATUTES—SUBJECTS AND TITLE—EXPRESSION OF SUBJECT IN TITLE—"BOULEVARD."

26 *Del. Laws*, c. 189, authorizing the organization of boulevard corporations and the construction by them of boulevards two hundred feet wide, part to be used as a road for vehicles and part to be ornamented by trees and other parking features, or to be utilized for railways, telegraphs, telephones, pipe lines, etc., and providing for the maintenance of the road for vehicles by the state, for a new state official with supervision over such road, and for a new item of public expense in maintaining it, is not invalid, under *Const. art.* 2, § 16, as containing more than one subject, part of which are not germane to its title, reciting that it is an act to amend the general corporation law, by authorizing the organization of boulevard corporations, or which are not germane to the title of the general corporation law, since the popu-

lar meaning of the word "boulevard" is a broad and attractive highway designed and used for the transportation of persons and things by any of the means now commonly employed on city streets or country roads, and all the provisions of the act relate to the one subject of the construction, operation, regulation, and maintenance of boulevards and boulevard corporations.

**3. STATUTES—SUBJECTS AND TITLES—ACTS RELATING TO MORE THAN ONE SUBJECT.**

Under *Const. art.* 2, § 16, providing that no bills excepting those appropriating money shall embrace more than one subject, which shall be expressed in its title, matters apparently constituting distinct and separate subjects are properly included in one act, unless they are incongruous and diverse to each other.

**4. STATUTES—SUBJECTS AND TITLES—ACTS RELATING TO MORE THAN ONE SUBJECT.**

The inclusion in one act of provisions relating directly or indirectly to the same subject, which are naturally connected and not foreign to the subject expressed in the title, does not violate *Const. art.* 2, § 16, providing that bills shall not embrace more than one subject, which shall be expressed in the title.

**5. STATUTES—SUBJECTS AND TITLES—ACTS RELATING TO MORE THAN ONE SUBJECT.**

An act providing for the organization of a corporation may include provisions relating to its operation, regulation, control, and maintenance, without violating *Const. art.* 2, § 16, providing that bills shall not embrace more than one subject, which shall be expressed in the title.

**6. STATUTES—SUBJECTS AND TITLES—ACTS RELATING TO MORE THAN ONE SUBJECT.**

26 *Del. Laws, c.* 189, providing for the organization of boulevard corporations and the construction by them of boulevards, part to be used as a highway for vehicles and part for public utilities, such as railways, etc., is not rendered invalid as embracing more than one subject, contrary to *Const. art.* 2, § 16, by the provision that the highway for vehicles shall be conveyed to and maintained by the state, while the rest of the boulevard is to belong to and be under the care of the corporation, since the act contemplates that the boulevard shall constitute an indivisible entity and be used in its entirety as a boulevard.

**7. STATUTES—SUBJECTS AND TITLES—ACTS RELATING TO MORE THAN ONE SUBJECT.**

Such act does not violate such constitutional provision because it provides for an exemption of the property of boulevard corporations from taxation.

**8. STATUTES—GENERAL AND SPECIAL STATUTES—CONSTITUTIONAL PROVISIONS.**

26 *Del. Laws, c.* 189, authorizing the organization of boulevard corporations and the construction by them of boulevards, does not violate *Const. art.* 9, § 1, prohibiting the creation of corporations by special law, nor *article* 2, § 19, prohibiting special laws relating to the laying out, opening, etc., of highways, since such act is not a special but a general law, authorizing any five persons to form a boulevard corporation, and relating to a class of corporations which by reason of the difference between boulevards and ordinary highways is not an arbitrary or unreal class.

9. STATUTES—GENERAL AND SPECIAL LAWS.

That a statute framed in general terms, authorizing the organization of a class of corporations, was passed at the instance and request of an individual, who gave the Legislature assurance that he would organize such a corporation, does not render it a special law.

10. STATUTES—GENERAL AND SPECIAL LAWS—"GENERAL LAW".

A law having a uniform operation as to all persons uniformly situated is a "general law," and not a special law.

11. STATUTES—SPECIAL LAWS—CLASSIFICATION OF SUBJECTS.

To render the classification of subjects of legislation valid, it must not be arbitrary or unreasonable, but must be a real classification, resting upon some difference bearing a reasonable and just relation to the act in respect to which the classification is proposed.

12. EMINENT DOMAIN—PUBLIC USE—WHAT CONSTITUTES.

Land taken by eminent domain under the authority of 26 *Del. Laws, c.* 189, for the construction of a boulevard on which a highway for vehicles, a railway, and other public utilities are to be built, and the land beautified by means of trees, walks, etc., is taken for a public purpose; and hence that act does not violate *Const. art.* 1, § 8, providing that no man's property shall be taken or applied to a public use without the consent of his representatives, and without compensation being made.

13. EMINENT DOMAIN—DELEGATION OF POWER—CONSTRUCTION OF LEGISLATIVE ACTS.

The provisions of 26 *Del. Laws, c.* 189, authorizing boulevard corporations to use that portion of a strip of land acquired under that act for a boulevard, not devoted to a road for vehicles, for any other lawful purpose, only authorizes its use for other public purposes, and not for private purposes.

14. EMINENT DOMAIN—DELEGATION OF POWER—CONSTRUCTION OF LEGISLATIVE ACTS.

26 *Del. Laws, c.* 189, authorizes boulevard corporations to acquire by condemnation a strip of land, part to be used as a highway and part for other public utilities, such as railways, telegraphs, etc. It also authorizes state officials to determine the location of the boulevard, and provides that the part to be used for vehicles shall be conveyed to the state. *Held,* that the statute clearly indicates an intention that the boulevard and all its elements shall be for the use and accommodation of the public, and a boulevard corporation, by accepting and exercising the right of eminent domain, imposes the obligation on it of devoting such strip of land to public purposes; and hence such act is not invalid, as not providing that the public shall have the use of such strip.

15. EMINENT DOMAIN—DETERMINATION OF VALIDITY OF EXERCISE—JURISDICTION OF COURTS.

26 *Del. Laws, c.* 189, authorizing boulevard corporations to acquire a strip of land for boulevards two hundred feet wide, is not invalid as authorizing the acquisition of more property than is reasonably necessary for the proper and legitimate purposes of a boulevard; the necessity for the exercise of the power of eminent domain and the quantity of land necessary being a question for legislative determination, not reviewable by the courts, unless possibly where there has been a gross abuse of legislative discretion or manifest fraud.

16. EMINENT DOMAIN—EXERCISE OF DELEGATED POWER.

26 *Del. Laws, c.* 189, authorizes boulevard corporations to acquire land by condemnation for a boulevard, part to be used as a road for vehicles and part for other public utilities. *Section* 168 exempts from taxation the land acquired, so long as not devoted to any of the utilities mentioned, and permits its exemption to extend for fifty years. *Section* 158 authorizes the corporation at any time to construct a railway on the part not devoted to a road for vehicles. *Section* 161 authorizes it at any time to use such portion for specified purposes. *Section* 142 defines a "boulevard" as a broad strip of land, upon which must exist a well-built road for vehicles, and upon which may be constructed and maintained a railway and other utilities. The act further requires the construction of the road for vehicles within six years, but does not expressly limit the time within which the other utilities are to be constructed. *Held,* that the Legislature could not have intended that the public use could be indefinitely postponed, and the corporation, by accepting the provisions of the statute, is bound to devote the whole of the land to a public purpose within a reasonable time, which use may be enforced by the courts, or appropriate penalties imposed for a failure to devote it to such use.

17. EMINENT DOMAIN—EXERCISE OF DELEGATED POWER.

The power of eminent domain cannot be exercised, unless the property taken is to be devoted to a public use within a reasonable time thereafter.

18. STATUTES—PARTIAL INVALIDITY—EMINENT DOMAIN.

If 26 *Del. Laws, c.* 189, authorizing boulevard corporations to condemn land for boulevard purposes, does exempt such corporations from devoting the land to public purposes indefinitely, it is to that extent only invalid.

19. CONSTITUTIONAL LAW—CONSTRUCTION IN FAVOR OF CONSTITUTIONALITY.

While statutes delegating the power of eminent domain are strictly construed, and restricted to their clear expression and intention, the usual presumptions apply in favor of their constitutionality, and the court should so construe them, if possible, as to sustain their constitutionality.

20. CONSTITUTIONAL LAW—LEGISLATIVE POWERS—DELEGATION TO CORPORATIONS.

26 *Del. Laws, c.* 189, authorizing the construction by a boulevard corporation of a boulevard throughout the whole length of the state, creating a commission to have the absolute discretion of determining the feasibility and desirability of the route, requiring plans to be filed with the Secretary of State, and providing that they cannot be filed until approved by the state commission, is not invalid as delegating to the corporation the power of determining whether a state highway shall be constructed; the Legislature having itself determined that it shall be.

21. CONSTITUTIONAL LAW—LEGISLATIVE POWERS—DELEGATION TO CORPORATIONS.

That a boulevard is to be used in part as a road for vehicles does not preclude the state from delegating to corporations the right to condemn land therefor.

22. CONSTITUTIONAL LAW—DELEGATION OF POWER—CONSTRUCTION AND OPERATION OF LEGISLATIVE ACTS.

26 *Del. Laws, c.* 189, authorizing the construction of boulevards by corporations, part to be used as a road for vehicles and part for other public util-

ities, and providing that the corporation may grant, lease, or otherwise dispose of any of its franchises, does not authorize such corporations to transfer their right of eminent domain, and hence is not invalid as constituting a delegation of the state's sovereign power.

23.  CORPORATIONS—FRANCHISES—GRANT—VALIDITY.

That 26 *Del. Laws, c.* 189, grants to boulevard corporations franchises ordinarily exercised by separate and distinct corporations, does not render it invalid.

24.  CONSTITUTIONAL LAW—DELEGATION OF SOVEREIGNTY.

26 *Del. Laws, c.* 189, authorizes the construction of boulevards by corporations, the part to be used for vehicles to be conveyed to and maintained by the state, and authorizes the corporation to institute actions to compel the state to maintain such part of the boulevard in as good condition as when conveyed to it.   *Held* that, while the authorization to institute such actions may be unwise, it is not invalid, as a delegation of the state's sovereign powers; the question of whether the necessity for repairs exists or not being in every case a question determinable by the court, and not the corporation, especially as there is nothing in the act precluding the Legislature from acquiring boulevards from the boulevard corporations by the exercise of the power of eminent domain.

25.  PROHIBITION—SCOPE OF INQUIRY AND POWERS OF COURT.

The Supreme Court, on a petition for a writ of prohibition, cannot determine issues of fact dehors the record, raised by the petition, answer, and accompanying affidavits; it having no machinery for the determination of such issues.

26.  STATUTES—ENACTMENT—PASSAGE.

26 *Del. Laws, c.* 189, was constitutionally enacted; the enrolled bill being the one passed by the Legislature.

(*July* 19, 1912.)

CURTIS, Chancellor, PENNEWILL, Chief Justice, and BOYCE, WOOLLEY and RICE, Associate Judges, sitting.

*Henry Ridgely* and *Caleb S. Layton* for complainant.

*Charles W. Cullen* and *Robert H. Richards* for respondents.

Supreme Court, Special Term, June 12, 1912.

Original petition by Jehu H. Clendaniel for a writ of prohibition against Henry C. Conrad, Associate Judge resident in Sussex County, and others.   On rule to show cause why the writ should not issue.   Rule discharged, and petition dismissed.

Upon receiving a communication from General Thomas Coleman du Pont in relation to the building of a highway or state

road running from the northern to the southern boundary of the state, the Governor sent it with a special message to the General Assembly (*House Journal* 470) recommending such legislation as might be necessary to effectuate the proposal contained in the communication.    Acting upon the proposal and recommendation of the Governor the General Assembly passed an act, entitled "An Act to Amend an Act entitled, 'An Act Providing a General Corporation Law' (being *Chapter 273, Volume 21, Laws of Delaware*, as amended) by authorizing the organization of Boulevard Corporations," which act, approved March 31, 1911, is *Chapter 189, Volume 26, Laws of Delaware.*

On the sixteenth day of October following, the said Thomas Coleman du Pont and others, under authority of said last mentioned act, filed in the office of the Secretary of State Articles of Association, whereby was created a corporation by the name of "Coleman du Pont Road, Incorporated," which, by its said Articles of Association, disclosed its object and purpose to be that "of forming a corporation, which shall have perpetual succession, for the purpose of locating, building, constructing, maintaining and operating a BOULEVARD extending from a place in the northern part of New Castle County, by as nearly a straight course as may prove feasible and desirable, through the State of Delaware to the southern boundary thereof, and for the purpose of constructing upon said boulevard a well built road for vehicular travel such as is required by said act as amended, and for the purpose of constructing, maintaining, and operating upon said boulevard a railway or railways for the transportation of freight and passengers, the carriages, coaches and cars of which are to be moved or propelled by electricity, by cable, or motor, or by any improved motive power other than steam, and for the purpose of laying, maintaining and operating pipes and conduits beneath the surface of said boulevard for distributing steam, heat and power, and for the purpose of distributing along said boulevard, either by poles and wires above the surface or by pipes or conduits and wires below the surface, electricity and

electric current for any purpose whatsoever, and for the purpose of laying, maintaining and operating, beneath the surface of said boulevard, pipes, tubes, mains and conduits for the distribution or transportation of gas, water or oil or any other useful article, and for the purpose of constructing and operating, either upon or under the surface of said boulevard, or both upon and under the surface thereof, telegraph or telephone lines, by means of poles and wires, or cables, or underground conduits, or otherwise, and for the purpose of beautifying said boulevard by means of trees, grass, flowers and shrubbery, and for the purpose of generating, manufacturing, producing and providing steam, heat, power, electricity, electric current, gas, water, oil, or any other useful article for distribution by means of the agencies hereinabove mentioned, and for the purpose of distributing and selling steam, heat, power, electricity, electric current, gas, water, oil, or any other useful article, and for the purpose of transmitting, sending and receiving telegraph and telephone messages, by means of the appropriate agencies aforesaid, and also for the purpose of using said boulevard for any other purpose not unlawful and not necessarily detrimental to the use of the said road for vehicular travel to be constructed thereon.   *   *   *''

And on the same day organized, and at its meeting for organization adopted the following resolution, viz.:

"*Resolved*, That the proper officers of this corporation do proceed forthwith to take the necessary steps to enable the corporation to condemn any land, sand, earth, gravel or other materials that may be necessary to be taken and used in the construction of the boulevard, to construct which this corporation was organized; and

*Be it Further Resolved*, That the proper officers of this corporation be, and they hereby are, authorized to execute all notices, petitions or other papers necessary and proper, and advised by counsel, to effectuate the condemnation of any such land, sand, earth, gravel or other material; and to affix the corporate seal of this corporation thereto."

The corporation thereafter proceeded to make surveys and to establish the route, or parts thereof, of its said boulevard, in

accordance with the requirements of the act, and did further proceed to acquire its right-of-way. On the fourth of January, 1912, the corporation deposited in the office of the Secretary of State a survey of a section of the route of its boulevard extending from the town of Georgetown to or near the Town of Milford, said section being all located in the County of Sussex and passing through the lands of the said Jehu H. Clendaniel. On the twenty-fourth day of April, 1912, the corporation, having previously given the notice prescribed by the act, presented a petition to Associate Judge Conrad, resident in Sussex County, for the purpose of condemning the right-of-way for its boulevard through the lands of the said Clendaniel, wherein the said corporation, *inter alia*, did aver that "for the purpose of locating and constructing said boulevard mentioned and authorized by the charter, or certificate of incorporation, of the said Coleman du Pont Road, Incorporated, and for the purpose of constructing upon said boulevard a well built road for vehicular travel, of the character aforesaid, and for the purpose of constructing, maintaining and operating upon said boulevard a railway or railways for the transportation of freight and passengers, of the character aforesaid, and for the purpose of laying, maintaining and operating beneath the surface of said boulevard pipes, tubes, mains and conduits for public use and accommodation in the distribution and sale of steam, heat, power, electric current, gas, water, oil or other useful article, and for the purpose of distributing along said boulevard, in the manner aforesaid, electricity and electric current, and for the purpose of constructing and operating, by means of said boulevard, in any of the manners above indicated, telegraph and telephone lines, for public use in transmitting, sending and receiving messages or intelligence, at reasonable rates or charges, and for the purpose of beautifying said boulevard, as aforesaid, it is necessary that the corporation, petitioner, shall take and appropriate the following described parcel of land," etc., and in which said petition the corporation did further aver that it "intends in good faith to complete all of the said several public utilities, for which it is necessary to take said land, as aforesaid, and to operate the same, or cause the same to be completed and operated."

At the time of filing said petition, and subsequent to the filing thereof, Clendaniel, through his counsel, challenged the jurisdiction of the said Associate Judge to entertain said petition or take any action thereon, upon the ground that the statute by which said proceeding is authorized, to wit, the said *Chapter* 189, *Volume* 26, of the *Laws of Delaware*, is unconstitutional and void and therefore conferred no jurisdiction upon said Associate Judge in the premises.   This objection was overruled by the Associate Judge and the motion of Clendaniel's counsel to dismiss the said petition was denied and the Associate Judge adjourned further action on the petition until the eleventh day of May, 1912, for further proceedings thereon according to law.

Subsequently, on the third day of May, 1912, Clendaniel, through his counsel, filed a petition in vacation with the clerk of this court, in which he challenges the constitutionality of said *Chapter* 189, *Volume* 26, of the *Laws of Delaware*, and the jurisdiction of Associate Judge Conrad to entertain said petition or take any action therein, and also raises a question of fact *de hors* the record, by charging that the said corporation, or that the said directors thereof, do not intend in good faith to devote the whole of the said boulevard, two hundred feet in width, to the public use and have no plan for the devotion of any part thereof to the public use, unless it be the portion upon which is to be built a road for vehicular travel.   And prays for the issuance by this court of its writ of prohibition to prevent Associate Judge Conrad from proceeding in the premises.   With this petition Clendaniel filed six affidavits, identical in form and substance, made by certain persons, who depose and say that Thomas Coleman du Pont, as President of said Coleman du Pont Road, Incorporated, has repeatedly stated and admitted that no plan has been formed to devote any part of the boulevard not used for the road for vehicular travel to the public use and that the use to which said residue of said boulevard will be devoted is indefinite and contingent and that the said deponents do not believe that the said directors of said corporation intend in good faith to devote said residue to the public use but desire to acquire the same for speculative purposes.

In this connection, counsel for Clendaniel, in their brief before the Supreme Court, quoted from General du Pont's communication to the Governor, the following:

"It may not be desirable to immediately use the part of the said strip of land other than the thirty feet devoted to the road, as aforesaid, for any of the public utilities above mentioned, or otherwise. Indeed it may be looking far into the future, but I firmly believe the building of such a highway as I have above indicated, with the lateral roads that soon must follow, will give such an impetus to agriculture and tend to so largely increase the population of the state, that the use of this boulevard for the said public utilities will be practicable and thus every part of the state will be enabled to enjoy all the public utilities that exist in the cities at a minimum cost, because they will be distributed from a single producing station by means of this boulevard as a main trunk. I desire it to be distinctly understood, however, that I am not bound to build an electric railway or establish any of the other public utilities mentioned herein. I think it would be only fair that the said strip of land should be wholly exempt from taxation until such time as the portion thereof not devoted to the road should be occupied by and used for some one or more of the public utilities hereinabove mentioned, or for some other utilitarian purpose. I should expect such exemption to be provided for. I have been led to believe that the plan herein outlined can be made legally possible by comparatively simple legislative enactment by the present session of the General Assembly if the same should commend itself to you and to the Legislative Department of the state. The use of a corporation has been suggested because it would make my plan more easily feasible legally and might also enable me, sometime in the future, to be, in part at least, reimbursed for the cost of the road which is given to the state."

\*    \*    \*

On the same day, to wit, May 3, 1911, the petition, affidavits and exhibits were transmitted to the Chancellor. On the seventh day of May, the following determination of the judges and call for a special session of the Supreme Court was lodged with the Chancellor:—

"The petition of Jehu H. Clendaniel praying that a writ of prohibition of this court be issued against the said the Honorable Henry C. Conrad, Associate Judge of the State of Delaware, resident in Sussex County, and Thomas Coleman du Pont, and others, having been read by us, the judges of the State of Delaware of whom the Supreme Court shall consist for the purpose of issuing said writ of prohibition.

"We hereby certify that we consider that the matter contained in said petition and accompanying affidavits ought to be tried, heard and determined before the next regular term of said court, to be held on the third Tuesday in June, A. D. 1912.

CHAS. M. CURTIS,
*Chancellor.*

(Signed) JAMES PENNEWILL,
*Chief Justice.*

WM. H. BOYCE,
*Judge.*

VICTOR B. WOOLLEY,
*Judge.*

HERBERT L. RICE,
*Judge.*"

Whereupon the Chancellor made the following order:

"AND NOW, TO WIT, this seventh day of May, A. D. 1912, the foregoing petition of Jehu H. Clendaniel, praying that a writ of prohibition of this court be issued prohibiting and enjoining the Honorable Henry C. Conrad, Associate Judge of the State of Delaware, resident in Sussex County, from proceeding to hear and entertain a certain petition purporting to be the petition of the Coleman du Pont Road, Incorporated, for the appointment of freeholders to view land of the said petitioner to be taken by the said corporation and assess the damages of said petitioner by reason of the taking thereof, and prohibiting and enjoining Thomas Coleman du Pont, Lewis L. Dunham, Frank M. Williams, Sidney H. Henry and Paul E. Wilson from further proceeding before the Honorable Henry C. Conrad, Associate Judge as aforesaid, in the premises, having been filed in the office of the Clerk of the Supreme Court of the State of Delaware, and with the affidavits

accompanying the same having been transmitted to the Chancellor.

"AND IT APPEARING TO THE CHANCELLOR that the judges of whom the Supreme Court shall consist for the purpose of issuing said writ consider that the matters contained in said petition, and the affidavits accompanying the same, ought to be tried, heard and determined before the time of the next regular term of said court.

"IT IS, THEREFORE, ORDERED, ADJUDGED AND DECREED that a special session of said Supreme Court of the State of Delaware be and it is hereby called to meet at Dover, on Saturday, the eleventh day of May, A. D. 1912, at ten o'clock in the forenoon, to try, hear and determine only the said cause and the matters referred to in said petition.

"AND FURTHER, that notice of the said session of said court shall be given forthwith by the sheriff of Kent County by posting on the front door of the County Court House in Dover a proclamation of the calling of said special session.

"AND FURTHER, that a rule of this court be and it is hereby awarded to be directed to the said the Honorable Henry C. Conrad, Associate Judge of the State of Delaware, resident in Sussex County, Thomas Coleman du Pont, Lewis L. Dunham, Frank M. Williams, Sidney H. Henry and Paul E. Wilson, requiring him and them to appear before the said Supreme Court at said special session thereof to be held on Saturday, the eleventh day of May, A. D. 1912, at ten o'clock A. M., at Dover, to show cause, if any they have, why a writ of prohibition should not be awarded and issued as prayed for in said petition.

"AND FURTHER, that said rule be served forthwith by the sheriff of Kent County upon the respondents therein by leaving with them a copy thereof certified by the clerk of said court to be a true and correct copy thereof.

"AND FURTHER, that said sheriff make return to this court of his proceedings hereunder at the return day of said rule.

(Signed) CHAS. M. CURTIS,
*Chancellor.*"

1912, May eighth.  Certified copies of the call for a special session of the Supreme Court sent to each of the judges of said court.

1912, May eighth.  Rule to show cause why a writ of prohibition of this court should not be issued as prayed for, duly issued together with a certified copy of the same to be served upon each of the respondents therein, and delivered to the sheriff of Kent County, and made returnable on Saturday, the eleventh day of May, A. D. 1912, at Dover.

1912, May eighth.  Served personally within rule on the Honorable Henry C. Conrad, Associate Judge of the State of Delaware, and as to Thomas Coleman du Pont, Lewis L. Dunham, Frank M. Williams, Sidney H. Henry and Paul E. Wilson, certain of defendants, served the within rule by the acceptance of Robert H. Richards, Esq., their attorney.  So answers

JOSHUA B. RAUGHLEY, *Sheriff*.

At the return day of said rule, May 11, A. D. 1912, Associate Judge Conrad filed his separate return or answer, which was in effect but a certification from him to this court of a true copy of the record of the said proceeding before him.  At the same time, the other defendants filed their joint return or answer, under oath, wherein they do aver their intention, and the intention of Coleman du Pont Road, Incorporated, to devote the whole of said boulevard, two hundred feet in width, to the public use, and do set forth a plan for the development of the whole of said boulevard, adopted by said corporation, and state the manner in which the said corporation intends to devote said boulevard to the public use.  In addition to their return or answer, by leave of court first obtained, SUBJECT TO THE MOTION BELOW, the last named defendants also filed an affidavit of Thomas Coleman du Pont, wherein are denied in substance the material averments contained in the said six affidavits filed with the said petition; and certain other affidavits were also filed by the said defendants negativing the averments of said affidavits filed on behalf of the petitioner.

Whereupon Charles W. Cullen and Robert H. Richards,

attorneys for the defendants, move the court to refuse to hear any and all issues of fact, made by the petition, answers and affidavits filed in this cause, which are *de hors* the record of the proceeding before Associate Judge Conrad, which is sought to be enjoined and prohibited by the writ prayed in this cause.

Petitioner's counsel state that they have not seen the affidavits referred to in the motion of counsel for the respondents; that they make no objection to the filing of said affidavits, subject to the right to move that they be struck out if upon examination it shall be seen that they are not appropriate and relevant.

Hearing upon the rule continued to June twelfth, A. D. 1912, at ten o'clock A. M., the printed record and briefs of counsel to be filed not later than June 2, 1912, with privilege of both sides to file thereafter briefs in reply.

The rule coming on to be heard and after hearing arguments of counsel and maturely considering the same, the following opinions were announced on the nineteenth day of July, A. D. 1912.

PENNEWILL, C. J., delivering the opinion of the court:

On the second day of March, 1911, the Senate and the House of Representatives of the State of Delaware received from the Governor of this state a special message, which message contained the context of a letter the Governor had received from Gen. T. Coleman du Pont, and the letter set forth that if the State of Delaware by proper legislative action would authorize and enable the same, he, T. Coleman du Pont, through a corporation, would acquire by purchase or condemnation, a strip of land not less than one hundred nor more than two hundred feet wide, extending from some point in the northern part of New Castle County to the southern boundary of the state, upon which strip of land the said corporation would construct a good modern road, from twelve to eighteen feet wide, throughout the whole length of the state; that a portion of said strip of land not less than thirty feet wide should be devoted to the vehicular road and its accessories, and upon the remaining portion of the strip of land acquired the said corporation should have the right to construct certain other public utilities and to plant trees, grass or shrubbery; that as soon as the vehicu-

lar road was completed the said corporation should convey title to the thirty foot wide portion of said strip of land devoted to said vehicular road, unto the State of Delaware, free of cost to the state, and that the state should be required forever to maintain the road in the same condition as when turned over to it; that it might not be desirable to immediately use the part of the said strip of land, other than the thirty feet devoted to the road, for any of the public utilities; that the use of boulevards for public utilities would be practicable and that every part of the state would be enabled to enjoy many public utilities at a minimum cost by the use of a boulevard as a main trunk. The suggestion was made that the part of the strip of land not used for vehicular travel should be exempt from taxation for fifty years, or until used by some of the public utilities.

The Governor, in his message, recommended the enactment of proper legislation to effectuate the proposal.

The Senate the same day sent a concurrent resolution to the House of Representatives, providing for a joint session of the two houses to consider the message of the Governor, and on March 10, 1911, a concurrent resolution was passed, providing for a joint session for the purpose of conference with Mr. du Pont in respect to the highway proposition, pursuant to which resolution the said session was held in the Dover Opera House.

Some time after the tenth of March, 1911, a bill covering the essentials of the proposal, as contained in the du Pont letter, was introduced in the General Assembly as an amendment to the General Corporation Law of the state, and on the thirty-first day of March, 1911, the Governor of the state approved an act which had theretofore been passed by the General Assembly of the State of Delaware, entitled "An act to amend an act entitled, 'An act providing a general corporation law' (being *Chapter* 273, *Volume* 21, *Laws of Delaware*, as amended) by authorizing the organization of boulevard corporations," which said last mentioned act is printed in *Volume* 26 of the *Session Laws* of the State of Delaware as *Chapter* 189 thereof.

On the sixteenth day of October, 1911, Thomas Coleman du Pont, Lewis L. Dunham, Frank M. Williams, Sidney H. Henry

and Paul E. Wilson, under authority of said last mentioned act, filed in the office of the Secretary of State of the State of Delaware articles of association, whereby was created a corporation by the name of "Coleman du Pont Road, Incorporated," which, by its said articles of association, disclosed its object and purpose to be that "of forming a corporation, which shall have perpetual succession, for the purpose of locating, building, constructing, maintaining and operating a boulevard extending from a place in the northern part of New Castle County, by as nearly a straight course as may prove feasible and desirable, through the State of Delaware to the southern boundary thereof, and for the purpose of constructing upon said boulevard a well built road for vehicular travel such as is required by said act as amended, and for the purpose of constructing, maintaining, and operating upon said boulevard a railway or railways for the transportation of freight and passengers, the carriages, coaches and cars of which are to be moved or propelled by electricity, by cable, or motor, or by any improved motive power other than steam, and for the purpose of laying, maintaining and operating pipes and conduits beneath the surface of said boulevard for distributing steam, heat and power, and for the purpose of distributing along said boulevard, either by poles and wires above the surface or by pipes or conduits and wires below the surface, electricity and electric current for any purpose whatsoever, and for the purpose of laying, maintaining and operating, beneath the surface of said boulevard, pipes, tubes, mains and conduits for the distribution or transportation of gas, water or oil or any other useful article, and for the purpose of constructing and operating, either upon or under the surface of said boulevard, or both upon and under the surface thereof, telegraph or telephone lines, by means of poles and wires, or cables, or underground conduits, or otherwise, and for the purpose of beautifying said boulevard by means of trees, grass, flowers and shrubbery, and for the puprose of generating, manufacturing, producing and providing steam, heat, power, electricity, electric current, gas, water, oil, or any other useful article for distribution by means of the agencies hereinabove mentioned, and for the purpose of distributing and selling steam, heat, power, elec-

tricity, electric current, gas, water, oil, or any other useful article, and for the purpose of transmitting, sending and receiving telegraph and telephone messages, by means of the appropriate agencies aforesaid, and also for the purpose of using said boulevard for any other purpose not unlawful and not necessarily detrimental to the use of the said road for vehicular travel to be constructed thereon.   *   *   *"

The said corporation organized the same day, and at its meeting for organization adopted the following resolution, viz.:

"*Resolved*, that the proper officers of this corporation do proceed forthwith to take the necessary steps to enable the corporation to condemn any land, sand, earth, gravel or other materials that may be necessary to be taken and used in the construction of the boulevard, to construct which this corporation was organized; and

"*Be it further Resolved*, that the proper officers of this corporation be, and they hereby are, authorized to execute all notices, petitions or other papers necessary and proper, and advised by counsel, to effectuate the condemnation of any such land, sand, earth, gravel or other material, and to affix the corporate seal of this corporation thereto."

The said corporation thereafter proceeded to make surveys and to establish the route, or parts thereof, of its said boulevard, in accordance with the requirements of said act, and did further proceed to acquire its right of way.   On the eighteenth of November, 1911, the directors of said corporation did adopt a fixed general plan for the development and construction of the boulevard to be built by said corporation.   On the fourth of January, 1912, the said corporation deposited in the office of the Secretary of State a survey of a section of the route of its said boulevard extending from the Town of Georgetown to or near the Town of Milford, said section being all located in the County of Sussex, and State of Delaware, and passing through the lands of Jehu H. Clendaniel, the petitioner.   On the twenty-fourth day of April, 1912, the said corporation, having previously given the notice prescribed by said act, presented a petition to Henry C. Conrad, Associate Judge resident in Sussex County, for the purpose of

condemning the right of way for its said boulevard through the lands of the said Clendaniel, wherein the said corporation, *inter alia*, did aver that "for the purpose of locating and constructing said boulevard mentioned and authorized by the charter, or certificate of incorporation, of the said Coleman du Pont Road, Incorporated, and for the purpose of constructing upon said boulevard a well built road for vehicular travel, of the character aforesaid, and for the purpose of constructing, maintaining and operating upon said boulevard a railway or railways for the transportation of freight and passengers, of the character aforesaid, and for the purpose of laying, maintaining and operating beneath the surface of said boulevard pipes, tubes, mains and conduits for public use and accommodation in the distribution and sale of steam, heat, power, electric current, gas, water, oil or other useful article, and for the purpose of distributing along said boulevard, in the manner aforesaid, electricity and electric current, and for the purpose of constructing and operating, by means of said boulevard, in any of the manners above indicated, telegraph and telephone lines, for public use in transmitting, sending and receiving messages or intelligence, at reasonable rates or charges, and for the purpose of beautifying said boulevard, as aforesaid, it is necesssary that the corporation, petitioner, shall take and appropriate the following described parcel of land," etc., and in which said petition the said corporation did further aver that it "intends in good faith to complete all of the said several public utilities, for which it is necessary to take said land, as aforesaid, and to operate the same, or cause the same to be completed and operated."

At the time of filing said petition, and subsequent to the filing thereof, the said Jehu H. Clendaniel, through his counsel, challenged the jurisdiction of the said Associate Judge to entertain said petition or take any action thereon, upon the ground that the statute by which said proceeding is authorized, to wit, the said *Chapter* 189, *Volume* 26, of the *Laws of Delaware*, is unconstitutional and void and therefore conferred no jurisdiction upon said Associate Judge in the premises. This objection of the said counsel for said Clendaniel was overruled by the said Associate Judge and the motion of the said Clendaniel's counsel to dismiss

the said petition was denied, and the said Associate Judge ad-
journed further action on said petition until the eleventh day of
May, 1912, for further proceedings thereon according to law.

Subsequently, on the third day of May, 1912, the said Clen-
daniel, through his counsel, filed a petition in this court praying
for the issuance by this court of its writ of prohibition to prevent
the said Associate Judge from further proceeding in the premises.
In his said petition, the said Clendaniel challenges the constitu-
tionality of said *Chapter* 189, *Volume* 26, of the *Laws of Delaware,*
and also raises a question of fact *dehors* the record, by charging
that the said corporation, or that the said directors thereof, do
not intend in good faith to devote the whole of the said boulevard,
two hundred feet in width, to the public use, and have no plan for
the devotion of any part thereof to the public use, unless it be the
portion upon which is to be built a road for vehicular travel. With
this petition the said Clendaniel filed six affidavits, identical in
form and substance, made by William I. Simpson, James P. Lof-
land, Frederick H. Whitehead, Lizzie H. Whitehead, Willard S.
Dickerson and John Kern, who depose and say that Thomas
Coleman du Pont, as president of said Coleman du Pont Road,
Incorporated, has repeatedly stated and admitted that no plan
has been formed to devote any part of the boulevard not used for
the road for vehicular travel to the public use and that there exists
only a general intention to construct public utilities thereon at
some indefinite future time, or to dispose of the same in some man-
ner, and that the use to which said residue of said boulevard will
be devoted is indefinite and contingent, and that the said deponents
do not believe that the said directors of said corporation intend
in good faith to devote said residue to the public use but desire
to acquire the same for speculative purposes.

Upon this petition, this court issued a rule upon the above·
named defendants to show cause why the writ of prohibition
prayed for should not issue, and made such rule returnable May 11,
1912.

At the return day of said rule, the Associate Judge filed his
answer or return, which was in effect but a certification from him
to this court of a true copy of the record of the said proceeding

before him.   At the same time, the other defendants filed their
return or answer, under oath, wherein they do aver their intention,
and the intention of Coleman du Pont Road, Incorporated, to
devote the whole of said boulevard, two hundred feet in width,
to the public use, and do set forth a plan for the development of
the whole of said boulevard, adopted by said corporation, and
state the manner in which the said corporation intends to devote
said boulevard to the public use.   Thus, by the petition and
answer, in addition to the constitutional questions raised, there
is raised a distinct issue of fact *dehors* the record.   In addition to
their return or answer, the last named defendants also filed an
affidavit of Thomas Coleman du Pont, wherein are denied in sub-
stance the material averments contained in the said six affidavits
filed with the said petition;  and certain other affidavits are also
filed by the said defendants negativing the averments of said
affidavits filed on behalf of the petitioner.

It is contended that the statute in question is in conflict
with *Section* 16, *Article* 2, of the *Constitution* of this state, in that
it amends *Chapter* 273, *Volume* 21, *Laws of Delaware*, being an
act entitled "An act providing a general corporation law," by
incorporating therein provisions not germane to the subject of
said chapter and not expressed in the title thereof, and also that
the said amendatory act, being *Chapter* 189, *Volume* 26, *Laws of
Delaware*, is in conflict with said constitutional provision in that
it embraces more than one subject.

The Constitution provides that "no bill or joint resolution,
except bills appropriating money for public purposes, shall embrace
more than one subject, which shall be expressed in its title."

Many states have constitutional provisions, exactly or sub-
stantially, similar to our own respecting the title of a bill, and
there have been many decisions of the courts thereon.   There is,
in the main, remarkable harmony in the cases as to the real pur-
pose of the constitutional provision, its meaning and scope.

The following language used by this court in the case of
*Monaghan v. Lewis*, 5 *Penn.* 218, 59 *Atl.* 948, 10 *Ann. Cas.* 1048,
expresses the thought and meaning of the courts in practically all
the cases, viz.:

"The object of this important provision of the Constitution is to prevent the joining in one act of several incongruous matters, and to prevent deception by provisions of which the title gives no intimation.

"While such construction should be given to this provision as will prevent the evils it was intended to remedy, it should not be so construed as to defeat or embarrass legislation where there has been a substantial compliance with its requirements. Where it is possible, it should be so construed as to uphold rather than destroy legislation.

"If all parts of an act relate directly or indirectly to the general subject of the act, it is not open to the objection of plurality.

"The Constitution does not require that the title should do more than state in general terms the subject of the act; it need not go into details or furnish an abstract, synopsis or index of the contents of the act."

Judge Cooley in his work on *Constitutional Limitations* (*7th. Ed.*) 209, says:

"There has been a general disposition to construe such a constitutional provision liberally rather than to embarrass legislation by a construction whose strictness is unnecessary to the accomplishment of the beneficial purposes for which it was adopted."

The same writer at *page* 172 says: "The generality of a title is no objection to it, so long as it is not made a cover to legislation incongruous in itself, and which by no fair intendment can be considered as having a necessary or proper connection."

In the case of *People v. Gaslight Co.*, 205 *Ill.* 490, 68 *N. E.* 952, 98 *Am. St. Rep.* 244, the court said: "It is clear that the broader and more general the subject the greater the number of particular or subordinate subjects which will be embraced within it."

Applying these principles to the present case, must the act in question be declared invalid?

It will be noted that the title of the amendatory act is very general, and that the act which it amends is still more general.

The plaintiff insists "that the said pretended act of the General Assembly of the State of Delaware undertook to amend the act entitled 'An act providing for a general corporation law' by incorporating therein provisions which were not germane to the subject of said last mentioned act, and which were not expressed in the title thereof," and that the act, therefore, embraced more than one subject, which is not expressed in its title.

In order to establish this fact recourse is had to the legislative record as well as to the bill itself.

[1] We have no doubt that reference may be had, in certain cases, to the message of the Governor and other matters constituting a part of the legislative record in connection with the bill, to aid the court in ascertaining its real object. It is urged, that such record clearly shows that the object of the bill was the securing of a state highway.

Whatever may be thus shown, we think it is nothing more than is disclosed by the bill itself, and it is, therefore, of no assistance in determining the question under consideration.

Counsel for the plaintiff, quoting from the Delaware case of *State v. Ferschke*, 2 *Boyce* 477, 81 *Atl.* 401, says:

"Unquestionably the principal object of said constitutional provision is that the title of an act, when published, shall be sufficiently comprehensive to give to the people, as well as the members of the Legislature, fair and reasonable notice of the subject-matter of the legislation proposed."

They say that, testing the bill by this principle, no one reading the title "An act providing a general corporation law," or the title of the amendatory act, would suspect that the highway system of the state was involved, that a new state road was contemplated, that a new state official was to be created, and that a new item of public expense was to be incurred. The title of the amendatory act, it is insisted, "is no more illuminating than the title of the act amended, but rather the reverse, for the addition of the words 'by authorizing the organization of boulevard corporations' would merely lead the reader of the title to believe that the object of the bill was the formation of street construction companies." It is not contended that the organization of boulevard

corporations could not have been embraced in the general corporation act, but it is strongly insisted that the amendatory act contains provisions that are foreign to the subject of boulevard corporations.

[2] We will consider, therefore, this question: Whether an act authorizing the organization of boulevard corporations would be in conflict with the constitutional provision above mentioned.

The answer to this question must depend upon the meaning of the word "boulevard". What does it embrace or suggest? Certainly much more than it anciently imparted, viz., "a promenade on a demolished fortification." Later it was defined to be "a broad street, promenade or walk planted with rows of trees."

In the light of modern conditions the word must be given a broader significance still. To the popular mind and understanding it suggests, at least, a broad and attractive highway, designed and used for the transportation of persons and things. Such transportation may be by any of the means now commonly employed on the streets of a city or on the roads of the country. A boulevard from the City of Wilmington to the southern boundary of the state conveys the idea of a state highway of course, and it is entirely in keeping with such idea that the highway should be ornamented by trees and other parking features.

The general subject of the bill, then, is that which is expressed by the title—a broad and attractive public highway; and we think it was entirely competent for the Legislature to provide in the bill for the construction on said highway of any means of transportation now in use. Railway, telegraph, telephone, and pipe lines are agencies commonly employed today for transportation purposes, and they cannot be regarded as incongruous with, or foreign to, the general subject of the amendatory act, to wit, the organization of boulevard corporations. The matters contained in the act, when thus considered, do not constitute distinct subjects, but merely express different ideas and purposes relating to, and connected with, the same subject.

[3] Matters which constitute, apparently, two distinct and separate subjects, are not so, in the meaning of the constitutional provision, unless they are incongruous and diverse to each other.

[4, 5]  The authorities all agree that if the provisions of the act relate directly or indirectly to the same subject, are naturally connected, and are not foreign to the subject expressed in the title, they will not be held unsonstitutional, as in violation of the provision under consideration.  It is not violated by any act having various details properly pertinent and germane to one general subject.  And the authorities also practically agree that, where the title provides for the organization of a corporation, the act may include any provisions relating to the operation, regulation, control and maintenance of the corporation.

Chief Justice Parker in the case of *Bohmer v. Haffen*, 161 *N. Y.* 390, 55 *N. E.* 1047, used the following language:

"While the title refers to the construction only of a railway and tracks, the regulation of the portion of the completed railroad belongs to and goes with it.  Anything germane to the general subject of building and operating a railroad might have been included in the original act of 1863 [Acts 1863, *c.* 361], provided it was not prohibited by some constitutional provision.  And that which might have been included in the original act without offending the constitutional provision under consideration may be incorporated into it subsequently by amendment without a change of title."

And in the present case, if the several provisions of the amendatory act are germane to the general subject of boulevard corporations, and might have been included in the original act, they can be incorporated by amendment.

In some cases it has been held that in an act to incorporate a railroad company a provision that any incorporated town might subscribe to the capital stock by an election, and issue bonds in payment of the stock, was not foreign to the title.  It was contended that such statutes, so far as they undertook to authorize municipalities to subscribe to the capital stock of the corporations, were unconstitutional, because they embraced two distinct subjects, one, the incorporation of the railroad company, and the other, the enlargement of the corporate powers of municipal corpora-. tions, the first of which alone was expressed in the title.  It is clear we think, that the management and regulation of boulevard

corporations, and the construction, management and regulation of the public utilities mentioned in the act, may all be reasonably contemplated by, and embraced within the definition of a boulevard, and that they are germane to and connected with such general subject.

[6] But it is insisted that the statute deals with more than one subject because it requires a certain portion of the boulevard to be conveyed to, and maintained by, the state, while the remaining part is to remain within the control of a private corporation. We cannot see that such a requirement makes the portion conveyed to the state any the less a part of the boulevard which is composed of the entire strip of land which the corporation was authorized to acquire.

According to our conception of the act, there is contemplated by its provisions a single scheme, one comprehensive plan of public improvement. The entire strip of land constitutes the boulevard, and that is an entity. It is not separable. Upon that portion of the strip outside the vehicular road certain utilities may be constructed, or such portion may be used for parking features or purposes—such as walks, trees and other ornamentation and conveniences. But the entire strip must be open to public use, and to some use contemplated by the act.

It is argued that the fact that the thirty-foot strip is to belong to and be under the care and charge of the state, and that the residue of one hundred and seventy feet is to belong to and be under the control of a private corporation, separates the two as wholly and actually as though they were to be maintained and operated on opposite boundaries of the state.

But it is a sufficient answer to this argument to say that the act itself provides that whatever is done by the corporation shall be done upon the "land acquired by it for the purpose of its boulevard." The entire strip of land is necessarily one indivisible entity.

We cannot see upon what theory the ownership and control by the state of the thirty-foot strip is not germane to, or directly connected with, the organization of the boulevard corporation. Certainly the Legislature had the power to make such convey-

ance a condition to the right of the corporation to construct, manage and operate the boulevard, whatever we may think of the wisdom of the provision. If the construction of the vehicular road is germane to the general subject, certainly its maintenance, after its construction, would be equally so. Then, how can the fact that the Legislature saw fit to require such road to be conveyed to the state disassociate it from the general subject? It is none the less a part, and the most essential part, of the boulevard.

It is true that the statute in a sense deals with more than one subject-matter, in that it deals with railways, telegraphs, telephones, pipe lines, etc.; but the obvious answer to this apparent plurality is that the instrumentalities or utilities mentioned are but parts, and reasonable parts, of the boulevard. They are members or functions of the body which is the boulevard itself.

In *State v. Electric Co.*, 52 *Or.* 502, 95 *Pac.* 722, the court held that a section of the act in question which provided for the payment to the state of ten per cent. of the net profits of the tolls as a condition upon which the grant is made was embraced within the title of "An act to appropriate funds for the construction of a steamboat canal." Such a provision was said to be properly connected with the subject of the act. It is the condition upon which the grant is made, with a view to partial compensation to the state for the grant. It is certainly not foreign to the subject. The title to the act contemplates the construction of the canal and locks, and the act may properly embrace provisions for its operation, including compensation to the state, and is not obnoxious to the clause of the Constitution within the rules above quoted.

[7] It cannot be successfully contended that the act violates the constitutional provision in that it provides for certain exemptions of the property of boulevard companies from taxation.

This question was distinctly before the court in the case of *National Loan & Investment Co. v. City of Detroit*, 136 *Mich.* 451, 99 *N. W.* 380, where the title was "An act to provide for the incorporation and regulation of certain corporations generally known as building and loan associations," and the act relieved the associations from the payment of taxes.

The court said: "We have frequently held that this section is not to be given a narrow or strained construction, and that, if the provisions of the statute are germane to the subject expressed in the title, this section is sufficiently complied with."

Our view of the act in question is that its general purpose was to provide for state boulevards, which should contain a road for vehicular travel, and that the remainder, not required for said road and its reasonable construction and operation, might be ornamented with trees, walks and other parking features, or devoted in part to such purposes and in part to such public utilities as are mentioned in the act. None of these purposes we think are inconsistent with the general subject and main idea of the bill, to wit, state boulevards, as expressed in the title. It matters not therefore that the bill does provide for the maintenance of the vehicular road by the state, and for a new state official, and involves an additional public expense.

These are matters of regulation and control, and entirely incidental to the general subject, which is the organization, construction and operation of a boulevard through the state. If there was any doubt that the term "boulevard" is broad enough in itself to reasonably include and contemplate the various provisions of the bill, such doubt must have been removed by the information the public had at the time the bill was pending in the Legislature. If resort may be had to that part of the legislative record which the plaintiff has invoked, viz., the message of the Governor, the public discussion, etc., it is manifest that both the members and the people knew that the organization of boulevard corporations contemplated all the important provisions embodied in the bill. The cases cited by the plaintiff upon the point now under consideration do not conflict with the conclusion we have reached. The argument of plaintiff's counsel is based upon the assumption that the different provisions of the bill are separate and distinct subjects. They treat the vehicular road as one thing, and the other public utilities mentioned as entirely diverse. We regard the boulevard as an entity, and as the one general subject, which includes, not only the vehicular road, but

also the public utilities and ornamentation that may be placed on the remaining part of the land.

The cases cited belong, for the most part, either to that class where the title of the act is deceptive, or to that other class where the title is too narrow and restricted. In the present case the title cannot be regarded as deceptive or restricted, because it is of the most general character, neither concealing the real purpose of the act nor failing to express the general subject of the legislation embodied in the act. Because of its general character we are of the opinion that the title of the act sufficiently meets the requirement that it shall give reasonable notice to the members of the Legislature, as well as to the people, of the legislation proposed.

In enacting the General Corporation Law it was the intention of the General Assembly to provide a broad, general scheme or plan for the creation, regulation and management of corporations, and for conferring powers upon them. This general scheme involves the classification of corporations, and provides different methods for the formation of different classes, and confers different powers upon them.

If the act is not in conflict with the constitutional provision under consideration because it provides for the creation and management of distinct corporations, how can an act be held to be unconstitutional which simply amends the general act by incorporating into it provisions for the organization, construction and management of another class of corporations, to wit, boulevards?

We are clearly of the opinion that the creation of boulevard corporations, with the rights, powers and franchises conferred by the amendatory statute, might have been included in the General Corporation Act, without contravening the constitutional provision under consideration. Such being the case, we cannot see any reason for holding that the amendatory act is in conflict with said provision, because it does not, any more than the original act, deal with more than one subject, nor fail in its title to express its subject.

[8]   It is contended by the plaintiff that the statute in question violates *Section* 1 of *Article* 9 of the *Constitution*, which provides

that "no corporation shall hereafter be created, amended, renewed or revived by special act, but only by or under general law," and that it also violates *Section* 19 of *Article* 2 of said *Constitution*, which. provides that "the general assembly shall not pass any local or special law relating to  *  *  *  the laying out, opening, altera-tion, maintenance or vacation, in whole or in part, of any road, highway, street, lane or alley."

In support of this contention it is argued that the real pur-pose of the statute was to create a special corporation, and to construct and maintain a special road or highway.

It is true that the corporation created by the act whose validity is attacked could not be created by a special act, neither could the road required by the act to be constructed be laid out and maintained under the authority of a local or special law.

Is the act special or local?

[9]  Very much was made at the argument of the fact that the legislation was asked for by a certain individual, Mr. T. Cole-man du Pont, and that he gave the assurance to the Legislature that he would, by and through a company to be organized by him, do the various things authorized by the act.  We may assume that the occasion, and the request, for the enactment of the law were special, but that does not necessarily determine the charac-ter of the act—whether special or general.  Very many, and per-haps most, general laws are suggested to the Legislature, and their passage, in a sense, secured, on account of special conditions. existing at the time.  Very often the necessity for a general law is not discovered until some individual interest or desire is affected or prompted.  A certain person may ask for the enactment of legislation that would be beneficial to himself, and the Legislature may conclude that such legislation would be of general benefit, and enact a general statute.  Adopting the very apt illustration used by counsel for the defendant at the argument: Suppose our General Corporation Law had not included electric railways.  It. is more than likely that in a very short time after its passage such law would have been amended so as to provide for the organiza-tion of such a public utility, and such an amendment would have

37

been suggested by the desire of some persons to construct and operate an electric railway.

[10] The distinguishing feature or characteristic of a general law is that it has a uniform operation as to all persons uniformly situated.

We do not think it necessary to review the many cases cited upon this point. The decisions in the various states upon this subject are almost innumerable, but after all the general principles recognized are the same in all the cases, and they are very clearly and correctly stated in *Lewis' Sutherland Statutory Construction* (*2d Ed.*) §§ 195, 196.

"A statute relating to persons or things as a class is a general law; one relating to particular persons or things of a class is special.

"The line of demarcation between general and special laws often seems indefinite and difficult to draw; but if the principles upon which the distinction rests are kept in mind, the difficulty is not nearly so great as it might seem. A law is general in the constitutional sense, which applies to and operates uniformly upon all members of any class of persons, places or things requiring legislation peculiar to itself in matters covered by the law, while a special law is one which relates and applies to particular members of a class, either particularized by the express terms of the act or separated by any method of selection from the whole class to which the law might, but for such limitation, be applicable."

The same authority in *Section* 203, quoting from the opinion of the court in the case of *Van Riper v. Parsons*, 40 *N. J. Law*, 1, says:

"A law framed in general terms, restricted to no locality, and operating equally upon all of a group of objects which, having regard to the purpose of the Legislature, are distinguished by characteristics sufficiently marked and important to make them a class by themselves, is not a special or local law, but a general law, without regard to the consideration that within this state there happens to be but one individual of that class, or one place where it produces effects."

Again says the same authority (*Section* 215):

"The number of persons affected by a law does not control or determine the question of its validity; it is enough that the law relates to a subject of a general nature, and is general and uniform in its operation upon every person who is brought within the relation and circumstances provided for by it."

Applying such principles to the case before us, can there be any doubt that the statute in question is a general law? The statute is general in form. It authorizes any five persons to associate themselves together, and by compliance with its terms organize a boulevard corporation. The boulevard which may be constructed by such a corporation is not local. It cannot be confined to any territorial subdivision of the state, but must extend practically throughout the state. The privileges offered by the act are open to all alike. All persons have an equal opportunity to take advantage of them. More than six months elapsed after the approval of the act before the organization of the "Coleman du Pont Road, Incorporated," and during that time or at any time thereafter any five persons had and have the right to organize such a corporation. There can be no such doubt provided the class of corporations created by the statute, and the class of highways provided for thereby are not artificial, arbitrary and unreal classifications, and, therefore, such as are not permissible under the law.

In the first volume of *Clark and Marshall on Corporations*, 105, we find the following:

"The fact that an act authorizing the formation of corporations or conferring powers or privileges on corporations does not apply to every person or corporation in the state, does not render the act special, if it has a uniform operation as to all persons uniformly situated. In other words, the fact that an act classifies persons who may form a corporation, or the purposes for which corporations may be formed, or the corporations which shall enjoy the powers or privileges granted, does not render it a special act, if the classification is reasonable, and if the act applies to all persons or corporations falling within the particular classes."

[11] The classification must not be arbitrary or unreasonable.

It must be a real classification, and rest upon some difference which bears a reasonable and just relation to the act in respect to which the classification was proposed.

The classification made by the statute under consideration is of corporations, and the class established is boulevard corporations. The idea involved, and the thought in the minds of the Legislature, was boulevards.

We think the classification made by the statute is not unreal, unfair, artificial, arbitrary or unreasonable in view of the meaning of the word "boulevard".

The General Corporation Law of this state had already established as a class corporations for the construction, maintenance and operation of electric railways, telegraph and telephone lines and corporations for the construction, maintenance and operation of pipe lines for the transportation of commodities, and power transmission lines. The statute in question provides for the organization of boulevard corporations. A boulevard as we understand it may include not only a road which is ordinarily known as a public highway, but also any or all of the other utilities mentioned in the act, as well as other features, such as ornamentation by walks, trees, etc.

These features sufficiently distinguish a boulevard from a road or highway to make boulevard corporations a real and distinct class in themselves. There can be nothing unreasonable or arbitrary about such a classification. It may be something comparatively new, but the classification is none the less real and reasonable because it is the outgrowth of modern conditions, and was not thought of at the time of the enactment of the General Corporation Law.

The following clear and concise statement of the law made in *State ex rel. v. Parsons*, 40 *N. J. Law*, 123, seems to us to be especially applicable to the present case:

"A law framed in general terms, restricted to no locality, and operating equally upon all of a group of objects which, having regard to the purposes of the legislation, are distinguished by characteristics sufficiently marked and important to make them a class by themselves, is not a special or local law, but a general law."

Judged by such a test we are clearly of the opinion that the statute before us cannot be held to be in conflict with either of the constitutional provisions now under consideration.

[12]   It is further contended that the uses for which the statute authorizes land to be taken by the power of eminent domain are not public uses, and it is therefore in conflict with *Section 8* of *Article* 1 of the state *Constitution*, which provides as follows: "Nor shall any man's property be taken or applied to public use without the consent of his representatives and without compensation being made."

We understand that this contention of the plaintiff is based upon the ground that the uses for which the statute authorizes the land to be taken are not public uses. The particular objection is that as to a very large portion of the said land no public use or service is required, it being left entirely optional with the private corporation provided for in the act, whether the utilities mentioned shall ever be constructed or not.

The court in the case of *Attorney General v. Williams*, 174 *Mass.* 476, 55 *N. E.* 77, said:

"The uses which should be deemed public in reference to the right of the Legislature to compel an individual to part with his property for a compensation, and to authorize or direct taxation to pay for it, are being enlarged and extended with the progress of the people in education and refinement."

In *Tuttle v. Moore*, 3 *Ind. T.* 712, 64 *S. W.* 585, the court used this language:

"What is a public use? A historical research discloses the meaning of the term 'public use' to be one of constant growth. As society advances, its demands upon the individual increase, and each demand is a new use to which the resources of the indi vidual may be devoted."

Courts and text-writers have taken different views of the meaning of the phrase "public use"; but we think the taking of land for boulevard purposes, herein defined, or for any of the purposes mentioned in the act, would be a taking for a public use within the contemplation of the constitutional provision. If the taking of land for a highway, or for an electric railway, would be

a taking for public use, it is difficult to see why it would not be equally so if taken for a boulevard, which would include those things and also other public utilities.

There can be no doubt that the power of eminent domain may be delegated to a private corporation for the construction of a highway as ordinarily understood; and no one will say that a highway is not a public use.

It has been held by the Court of Errors and Appeals of this state, *Whiteman v. R. R. Co.*, 2 *Harr.* 514, 33 *Am. Dec.* 411, that the right of eminent domain might be exercised whenever the interest or convenience of the state is concerned, as where land is wanted for a road, canal· or other public improvement; that in case of public improvement from which a benefit would result to the public, this right may be exercised through corporate bodies or by means of individual enterprise.

. In *Mills on Eminent Domain* (2d. Ed.) § 21, it is said:

"The term 'public use' is flexible, and cannot be confined to the public use known at the time of the framing of the Constitution. All improvements that may be made, if useful to the public, may be encouraged by the exercise of eminent domain. Any use of a thing which will satisfy a reasonable public demand for facilities for travel, for transmission of intelligence or commodities * * * would be a public use."

There can be no doubt that every one of the features or elements of the boulevard contemplated by the statute, road, railway, telegraph and telephone lines, pipe lines, and the beautification of the land by walks, trees, etc., has been judicially decided to be a public use. But the ground of objection upon which the plaintiff chiefly relies is that the statute does not require the land taken to be devoted to any public use. This is, we think, the most serious and difficult question that has been raised in the case, and has received from the court the most careful and thorough examination.

The practical and plain question is this: Whether the Legislature can authorize an individual or a corporation to take land of another by condemnation proceedings for public use, and give such individual or corporation the right to hold the land indefi-

nitely, or for a long period of years, without making any use of it that is beneficial to the public, or that is contemplated by the act. Thirty feet of the strip is required to be used for a vehicular road, but the statute does not specifically require the corporation to make any use of the remaining one hundred and seventy feet. Apparently it is left entirely optional with the corporation whether it shall use this land or not.

[13] We are not at all impressed with the argument of plaintiff's counsel that such one hundred and seventy feet may be used for private purposes, or for any purposes other than those mentioned in the act.

The statute does provide that "every boulevard corporation organized under the provisions of this act shall have full power and authority to use that portion of its boulevard or strip of land, not devoted to the road for vehicular travel, for any other purpose that may be desired, provided such purpose is not unlawful," etc.

But when the Legislature in the same act delegated to corporations organized under it the power of eminent domain for the purpose of organizing, constructing, operating and maintaining a boulevard, it is manifest that no purpose or use but a public one could have been intended to be meant by the words "any other purpose not unlawful." The words "any other purpose," under a fair and reasonable construction of the act, mean other like purposes, or purposes connected with, or incidental to, the specific public uses mentioned as constituent elements of a boulevard. They probably mean nothing more, and grant no greater privileges than the corporation would possess if such words had not been used. Such words must be construed to import purposes *ejusdem generis* with the purposes specially mentioned, and to mean other like purposes, or other like public purposes. *In re Barre Water Co.*, 62 *Vt.* 27, 20 *Atl.* 109, 9 *L. R. A.* 195; *Slingerland v. Newark*, 54 *N. J. Law*, 62, 23 *Atl.* 129.

[14] Neither do we think there is much force in the point that the statute is unconstitutional because it does not expressly provide that the public shall be entitled to the use of the boulevard, and of the constituent elements thereof, or shall be entitled to the benefits to be derived from use of the same. Counsel for

the plaintiff in determining whether land is taken for a public use seem to make a distinction between the case where the public has the actual use and one where the public has the benefit of the use. While the distinction is rather fine, and academic in a sense, it is recognized by courts and text-writers. Assuming that to constitute a public use the public must have a legal right to the use of the service for which the property is taken, it is unquestionably the law that to give the public the right to such service it is not necessary that it should be expressly conferred by the statute. A corporation by the acceptance and exercise of the power of eminent domain impliedly undertakes such service respecting the subject for which the power is exercised. *Lewis on Eminent Domain* (*3d Ed.*) *Vol.* 1, §313.

We find the following in the text of *Nichols on the Power of Eminent Domain*, § 320:

"A railroad corporation in accepting a charter from the state impliedly contracts to furnish the public with reasonable and proper facilities for the transportation of passengers and freight. It may be compelled to discharge the duty thus assumed, and if additional lands are needed, it may be required to take and pay for them."

In the case of *Thoroughgood v. Georgetown Water Co.*, 77 *Atl.* 720, the Court of Chancery of this state declared that,

"When a corporation organized by private persons to erect and operate as a private business enterprise works of general public utility * * * receives aid from the public by the grant of valuable franchises * * * or a delegation of the right of eminent domain, the right is subject to an implied condition that the company shall assume an obligation to fulfill the public purpose on account of which the grant was made."

Very often the act delegating to a corporation the power of eminent domain does not expressly impose upon it the obligation of public service. But the corporation, by the acceptance and exercise of the power, impliedly undertakes such service respecting the subject for which the power is exercised.

In the case of *Borden v. Irrigation Co.*, 98 *Tex.* 494, 86 *S. W.* 11, 107 *Am. St. Rep.* 640 (approved by the Supreme Court of the

United States, 204 *U. S.* 667, 27 *Sup. Ct.* 785, 51 *L. Ed.* 671), the court said: "At the present day it would hardly be doubted that the mere acceptance of a franchise to build and operate a railway, or a telegraph or telephone line, a turnpike or a ferry, coupled with the power of eminent domain, would involve the assumption of duties to the public."

In *Turnpike Co. v. News Co.*, 43 *N. J. Law*, 381, the question was whether the statute gave to the public the right to the use and benefit of the lines of telegraph companies organized under it for the transmission of intelligence, etc. The statute did not expressly so provide. After considering certain provisions which indicated the legislative intent, the court said:

"These provisions of the law, in connection with the fact that the Legislature has granted the right to take private property, clearly evince a legislative intent to lay such companies under an obligation to the public to permit the use of their lines by all persons, under reasonable regulations; and in accepting the benefits of this law, the recipient of them assumes the performance of this duty to the public. This will admittedly constitute a public use authorizing the exercise of the right of eminent domain."

And so we say in the present case (1) that the company's acceptance of the benefits of the act, with the power and exercise of the right of eminent domain, imposed upon it the obligation of public use or service; and (2) that the provisions of the act itself clearly indicate the legislative intent that the boulevard and all its elements should be for the use and accommodation of the public, and that the public should have the right to such use, or to the benefits thereof, and the service to be supplied thereby. The different elements of the boulevard are described as public utilities and the purposes to which it is authorized to be devoted or used are all of a public nature and for the benefit of the public. The location of the boulevard was to be determined by the agents of the state; and the part to be used for vehicular travel is to be owned and maintained by the state.

Clearly the statute indicates that the land to be taken thereunder was for public use, that the public should have the right to its use, or the benefit of its use, and that there should be an obli-

gation resting upon the company to devote it to the public use.

[15]   It is further contended by the plaintiff that in order that land may be taken for public use it must be necessary for such use. And assuming that land taken for a boulevard is for a public use, it is insisted that a strip two hundred feet in width is not now, and cannot at any time hereafter, be reasonably necessary for the proper and legitimate purposes of a boulevard upon which the corporation is required to construct only a vehicular road thirty feet in width.

We do not think this contention is very seriously made.   It cannot be contended that only thirty feet would be reasonably necessary, even if the vehicular road alone was contemplated by the act.   In the construction and operation of such road some additional land on either side thereof would be necessary, but perhaps not of an aggregate width of one hundred and seventy feet.

But the land of the plaintiff is sought to be taken under the power of eminent domain for something more than the vehicular road, to wit, for a boulevard.   The boulevard, as we have heretofore said, is the entity and the whole, and the road only a part thereof.   It is true that the road is the only thing the corporation is expressly required to construct on the entire strip of land proposed to be taken; but, as we have seen, the corporation is impliedly required to use the entire strip for the use or benefit of the public.   Such an obligation is imposed by the manifest intent of the act.

Can it be said, therefore, that a strip of land two hundred feet in width is unnecessary for the purposes of a boulevard upon which a vehicular road thirty feet wide is expressly required to be constructed, and the residue of which, by implication of law, must be devoted to at least some of the public uses mentioned in the statute?   The uses to which the entire strip is to be devoted being public uses, not only is the necessity for the exercise of the power of eminent domain a question for legislative determination, but the quantity of land necessary for such use is also a question for the Legislature to decide.

In 1 *Lewis on Eminent Domain* (3d Ed.) 674, § 369, is found the following statement of the law on this subject:

"Whether the power of eminent domain shall be put in motion for any particular public purpose, and whether the exigencies of the occasion and the public welfare require or justify its exercise, are questions which rest entirely with the Legislature."

In *Volume* 2 of *Tiedeman's State and Federal Control of Persons and Property*, at *p.* 677, it is stated that,

"The courts cannot question the necessity for the taking, provided the land is taken for a public purpose. The legislative determination of the necessity is final, and is not subject to review by the courts."

And the law has been similarly declared by the courts of this state.

In the case of *Wilson v. B. & P. R. R. Co.*, 5 *Del. Ch.* 524, Chancellor Saulsbury said:

"The Legislature of the state is the sole judge of the necessity or expediency of the exercise of the right of eminent domain."

In *Whiteman v. Railroad Co.*, 2 *Harr.* 514, 33 *Am. Dec.* 411, the Court of Errors and Appeals of this state used this language:

"It is the established doctrine of this country, as well as of England, that the power to decide when the public interest requires the appropriation of private property to public use, and the right to provide for such appropriation against the will of the owner, are, with the single restriction of just compensation to him whose individual right of propety is invaded, inherent in the Legislature."

The law seems to be equally well settled that the quantity of land that can be taken for the public use mentioned in the act is a matter wholly within the discretion of the Legislature. And the courts cannot control such discretion when the Legislature has determined and fixed the quantity that may be taken.

We do not undertake to decide whether or not the courts might interfere where there had been a gross abuse of legislative discretion, or manifest fraud in the passage of the bill, because it is not contended that any such conditions existed in the passage of the bill in question.

"The Legislature is the proper body to determine the necessity of the exercise of the power [of eminent domain] and the extent

to which the exercise shall be carried; and there is no restraint upon the power save that requiring that compensation shall be made." *Mills on Eminent Domain* (2d Ed.) 95.

In *McGehee on Due Process of Law*, 275, it is stated:

"We find the absolute nature of the legislative discretion broadly stated by the Supreme Court of the United States in recent cases. 'By granting,' says the court, 'a right of way four hundred feet in width, Congress must be understood to have conclusively determined that a strip of that width was necessary for a public work of such importance'."

Such a strip was authorized to be condemned for a single track railroad. *Northern Pac. R. R. Co. v. Smith*, 171 *U. S.* 261, 18 *Sup. Ct.* 794, 43 *L. Ed.* 575; *Northern Pac. R. R. Co. v. Townsend*, 190 *U. S.* 267, 23 *Sup. Ct.* 671, 47 *L. Ed.* 1044; *U. S. v. Gettysburg*, 160 *U. S.* 668, 16 *Sup. Ct.* 427, 40 *L. Ed.* 576; *Burlington, etc., Co. v. Railroad Co.*, 165 *U. S.* 370, 17 *Sup. Ct.* 359, 41 *L. Ed.* 749; *McKennon v. Railroad Co.*, 69 *Ark.* 104, 61 *S. W.* 383.

In the case of *Stark v. Railroad Co.*, 43 *Iowa* 501, the Supreme Court held that land within the limits fixed by the Legislature for a railroad right of way is conclusively presumed to be necessary. *Penn. R. R. Co. v. Nat. Docks, etc.*, 57 *N. J. Law*, 86, 30 *Atl.* 183.

In the case of *Croley v. Railroad Co.*, 56 *S. W.* 615, the Court of Appeals of Texas held that, when the Legislature confers authority upon a railroad corporation to take land for a right of way of a stated width, it determines the necessity for taking a strip of that width, and the judiciary has nothing to do with the question when the limits are respected. *Coe v. Aiken* (*C. C.*) 61 *Fed.* 24; *Debuol v. Railroad Co.*, 111 *Ill.* 499; *Railroad Co. v. Pontiac*, 169 *Ill.* 155, 48 *N. E.* 485.

It has been no uncommon thing in this country for the Legislature to authorize the condemnation of a strip of land two hundred feet wide for a railroad, and sometimes, as we have seen, the width would be as great as four hundred feet. It may be said that a railroad is very different from a boulevard, in that its accessories and future development may require a considerable extent of land. But how can it be said that a boulevard, as contemplated

Opinion.

by the act authorizing it, may not reasonably require as great a width as two hundred feet?

The Legislature in its discretion has determined that it may, and we are of the opinion that the court has no power to control or interfere with that discretion which we must assume was honestly exercised.

It may be noted that in this state the Legislature has for a century or more authorized the condemnation of land for turnpikes varying in width from sixty feet to one hundred feet, with the requirement that an artificial road of only twenty feet wide should be constructed, although it required that the whole breadth taken be kept free and open; and so far as we know the necessity for so much land, or the power of the Legislature to determine the necessity for the improvement and the quantity of land necessary therefor, was never questioned.

[16] But the most important question still remains: Can the land sought to be taken be regarded as taken for public use when there is not only no express requirement that it shall ever be used, other than the thirty-foot road, but a clear implication in the statute that the corporation shall not have to use the one hundred and seventy feet for fifty years, if ever?

*Section* 168 of the act exempts the land acquired by the corporation, outside the thirty-foot road, from taxation so long as it is not devoted to any of the utilities therein mentioned, and permits this exemption to extend for a period of fifty years.

The plaintiff insists, not only "that the construction and operation of none of the utilities is compulsory, but that the corporation may fail to construct any one or all of them without subjecting itself to the penalty of an abandonment, or the loss of the right to the land condemned, because the corporation is authorized to hold the state-long strip of land of one hundred and seventy feet in width without devoting it to any kind of public use for fifty years, and perhaps forever."

*Section* 158 provides that every corporation formed under the bill "shall have the right, power and authority at any time to construct, maintain and operate upon that portion of the strip of

land acquired by it for the purpose of its boulevard, not devoted to the said road, for vehicular travel," a railway.

*Section* 161 provides that the said corporation "shall also have full power and authority at any time to use any portion of its boulevard not devoted to the road for vehicular travel for the purpose," etc.

*Section* 142 states that "a boulevard within the contemplation of this act is defined to be a broad strip of land upon which must exist a well built road for vehicular travel, and upon which may be constructed, maintained and operated a railway," and other utilities, "and which may also be used for any other purpose not unlawful and necessarily detrimental to the use of the said road for vehicular travel."

Everything but the vehicular road, it is insisted, is a mere possibility. But we have held the uses authorized to be much more than mere possibilities resting in the option of the corporation.

[17] The authorities cited by the plaintiff upon the point now under consideration undoubtedly show that one of the fundamental principles of eminent domain is that it shall not be exercised unless the property taken is to be devoted to a public use within a reasonable time thereafter, and this is a proposition of law that will not be denied.

Neither can it be denied that the rule, or doctrine, of reasonable time applies when no time limit is set for the construction of the proposed road.

Prior to the enactment of the General Corporation Law of this state, the special charters granted to railroad companies contained, as a rule, no such time limit. Nothing was said about the time in which the road should be constructed. But under the law such companies were required to construct the road in a reasonable time or suffer the loss of the right to condemn, or the right to the land condemned, as the case might be.

As counsel for the plaintiff very clearly and correctly state in their brief: "Such special charters, being silent on the question of the time within which the corporation was to construct its road after it proceeded to condemn land, left that question to the

courts, and the owner of the land condemned had his remedy by enjoining the condemnation proceedings in a case where the corporation had no intention to construct or operate the railroad within a reasonable time. Such corporation was also subject to the penalty of a loss of the right acquired by the exercise of the power of eminent domain through an abandonment of the contemplated railroad."

They insist, however, "that in the present bill the Legislature attempts to withdraw this power from the courts, and to deprive the owner of the land condemned of all judicial remedy." that the "bill not only does not require that the land condemned be devoted to some one of the utilities named within a prescribed period, but it does in positive and express terms undertake to authorize the corporation to withhold this land from any use whatever for more than half a century. Even the fifty years named in the bill is not so named as the time limit for the establishment of the alleged utilities. There is no time limit. The land might be withheld from public use for one hundred years and more, in fact, forever."

It is a sufficient answer to such objections to say that, even if there is in the statute no express requirement that the one hundred and seventy feet of land shall at any time be devoted to public use, there is an obligation imposed upon the corporation by the statute, and the acceptance of its provisions, to so use the said land in a reasonable time. The word "boulevard" imports public use in its entirety. The public must be entitled to the use, or the benefit of the use, of the property taken. Such use cannot be indefinitely postponed, and we do not understand that this is denied by the defendant corporation. One answer made by its counsel is that "the statute does specifically provide that the boulevard shall be devoted to the public use within six years when it provides that the road for vehicles shall be completed within that time. The portion of the boulevard on which the road exists cannot be separated from the remainder. It is a single entity."

While this is true, it does not seem to us to be a sufficient answer. It could not have been the intention of the Legislature

that the one hundred and seventy feet should not be devoted to any public use or benefit at any time. It could not of course be devoted to any private use, nor could it, for example, be permitted to become a wilderness, an eyesore to the public, or entirely unusable and unenjoyable by the public. It would have to be open in a reasonable time to public use or enjoyment by the construction and operation of the utilities mentioned in the act, or such of them as would reasonably require the quantity of land sought to be condemned.

The use of the land for any utility must be employed within a reasonable time and the employment by the corporation of one utility within a reasonable time will not extend or enlarge to the corporation the right to employ the land for another utility at a time that is unreasonable.

[18] It was unquestionably the purpose of the act, and the intention of the Legislature, to authorize the taking of the entire strip for public purposes, and any provision in the act which undertakes to exempt, or relieve, the corporation from such use indefinitely or forever, could not be effective. It would be an unwarranted and unconstitutional exercise of legislative power. It would not however affect the validity of the remaining parts of the act, for the statute is complete without it. "If when the unconstitutional part of a statute is stricken out, that which remains is complete in itself, and capable of being executed in accordance with the apparent legislative intent, wholly independent of that which was rejected, it must be sustained." *Cooley Const. Lim.* 211, *et. seq.*

The Legislature could not relieve the corporation from the public use of the land for which alone the exercise of the power of eminent domain is conferred, and which was the manifest and general scope and purpose of the act.

Notwithstanding such attempted exemption or relief, the courts would still have the power to enforce the public use within a reasonable time, or to impose the appropriate penalties for the failure to devote the land to public use. The power of the courts in this regard would be the same as it would be where the act makes no reference at all to the time when the work authorized

was to be constructed, as in the charters for railroad companies passed before the enactment of the General Corporation Law. The owner of the land condemned would have the same judicial remedy and redress.

That the courts would have this power under the act in question is not really denied by counsel for the corporation.

In their brief in reply they say:

"Even if it were a serious question as to when any boulevard corporation must construct and operate the other public utilities which it by its certificate of incorporation designated its purpose to construct and operate, if it were the law, we should be perfectly content with the plaintiff's proposition that they should be constructed and operated within a reasonable time. A reasonable time would be for the determination of the court in each case, under the particular circumstances of the case."

We are of the opinion that the act in question as construed is not obnoxious to the above mentioned provision of the Constitution which prevents any man's property from being taken or applied to public use without the consent of his representatives and without compensation being made.

[19] In this connection it may be noted that while statutes delegating the power of eminent domain are to be strictly construed and restricted to their clear expression and intention, nevertheless the usual presumptions in favor of the constitutionality of legislative enactments apply. And the duty rests upon the court of so construing the statute as to sustain its constitutionality if possible.

It is charged also by the plaintiff that the statute in question delegates a part of the state's sovereignty and powers which are essentially and inherently attributes of the General Assembly to a class of private corporations; that it confers upon them peculiar and special powers, privileges and exemptions, and grants to them an aggregation of franchises each of which belongs inherently and essentially to corporations of distinctive and separate classes; that it authorizes such corporations to grant, lease, or otherwise dispose of said franchises severally to other corporations; that it delegates to the first named class of corporations the right of

38

eminent domain without requiring such corporations to use the same, but permitting the same to be disposed of to other corporations.

We think this general statement embraces all the important elements of the plaintiff's general contention that the statute is void because it delegates to a private corporation a part of the state's sovereignty.

This objection to the validity of the act is based, in part, upon the assumption that the entire strip of land sought to be taken is not an entity, but that the vehicular road is one thing and the other public utilities mentioned in the act entirely distinct and separate things. And the objection is also, in part, based upon the further assumption that the act is special and local.

We have held that neither of these assumptions is sound or tenable, and it is not necessary to repeat here the reasons for so holding. But there are some other questions raised by the contention that the act is a delegation of a part of the state's sovereignty, and these we will now consider.

[20]  Does the act vest a private corporation with the extraordinary power of determining finally whether the State of Delaware shall have a state highway? It would seem clear that the state had itself determined by enacting the statute that there should be a highway through the state. The corporation is required to build such a highway in a certain time. The boulevard corporation cannot construct its boulevard, after its organization, but by the permission of the state authorities. The commission created by the statute have the absolute discretion to determine the feasibility and desirability of the route between any stated termini. No work can be done until plans are filed with the Secretary of State, and no plans can be filed until they are approved by the state commission. Such provisions in the law sufficiently protect the state, because they enable it to determine, through its official representatives the feasibility and desirability of the proposed route as well as the character and quality of the road.

[21]  We are unable to see any reason why the state may not authorize the organization of corporations for the construction and operation of boulevards such as are contemplated by the statute

even though they contain as a part of the boulevard a road for vehicular travel. A turnpike is a public highway, and no one has ever questioned the right of the state to authorize a private corporation to condemn a broad strip of land for a turnpike road.

It is claimed that the statute grants to a particular class of corporations an aggregation of franchises each of which belongs inherently and essentially to corporations of distinct and separate classes, and that it authorizes such particular class of corporations to grant, lease or otherwise dispose of their rights to other corporations to be by them operated on said boulevard.

When it is considered what the rights are that may be thus granted we know of no constitutional prohibition against the authorization.

[22] By no reasonable construction can the statute be held to permit boulevard corporations to dispose of their power of eminent domain to other corporations. The power of eminent domain is expressly granted to or mentioned in connection with boulevard corporations; and nowhere are such corporations expressly or by implication given the power to grant the right of eminent domain to other corporations with which such boulevard corporations may contract for the operation of some one or more of the boulevard elements. *Jersey City v. Railway Co.*, 74 *N. J. Law*, 774, 67 *Atl.* 113.

[23] Having determined that boulevards, as herein defined, is a reasonable and proper classification, we cannot see that the granting to such corporations of an aggregation of franchises, which belong inherently and essentially to corporations of distinct and separate classes, is in contravention of any constitutional inhibition when such corporations, ordinarily distinct and separate, are embraced within the boulevard corporation, and constitute a part thereof.

[24] But perhaps the grounds chiefly relied on in support of the plaintiff's contention that the act is a delegation of the state's sovereignty, are these:

1. That it attempts to place within the power of a private corporation the right to usurp the state prerogative in respect to the construction and maintenance of state highways.

2. That the obligation imposed upon the state to maintain the vehicular road in as good condition as it is when conveyed to it will be perpetual, or at least within the powers, and at the pleasure, of a private corporation—the creature of the state.

We are entirely unable to see that the state is parting with a part of its sovereignty by providing that a private corporation may construct a highway and give it to the state, when it is done by authority of the state, without expense to the state. If the state may, in the exercise of its sovereign power, provide safe and convenient ways for the public necessity and convenience, why is it not possible for it to secure such ways through the instrumentality of a corporation which is willing to construct and convey them to the state? Instead of parting with its sovereignty by so doing, it seems to us to be in the active exercise thereof.

We might question the wisdom of the Legislature in granting to a private corporation the power to compel the state to maintain the vehicular road. It may seem to some persons belittling to the dignity of the state, and inconsistent with their conception of state sovereignty. But that does not make the act unconstitutional, nor is it a surrender of state sovereignty in the constitutional sense. The Legislature had the power to authorize the construction of the road by a private corporation, and provide for its conveyance to the state. It also had the power of agreeing to maintain the road after the conveyance, as provided for in the act. If there is any question at all, it goes to the propriety and wisdom of the act rather than to the legislative power.

But the corporation has no power to compel the state to repair the thirty-foot road unless the road "shall clearly be in worse condition than when completed and conveyed to the state." And even then it can require only "such repairs as shall be necessary to restore said road, or any part thereof, to the same condition as when it was originally completed and conveyed to the state."

The act provides for the appointment by the Governor of a state official, a superintendent of highways, whose duty it is to have supervision of, to direct, and to superintend the repair and maintenance of all roads, and all bridges, culverts and crossings

forming a part thereof, constructed and conveyed to the state by boulevard corporations under the provisions of the act.

So long, therefore, as this state official does his duty, the corporation cannot compel the state to make any repairs. The superintendent of highways is constituted the judge of the necessity in the first instance, and the court or jury in the last. The corporation is given the power, it is true, to institute appropriate actions to compel the state to perform this duty imposed upon it by the act; but whether the necessity exists or not may in every case be a question for the court or jury to determine, and not the corporation.

But we can conceive that the Legislature may have thought, and very naturally, too, that in order to insure the maintenance of the road in good condition, it ought to be expressly provided that the state should maintain it, and that the power should be given to some one to secure the performance of that duty whenever the necessity arose. It might have been better, perhaps, certainly more becoming, to confer such power upon a well selected commission, rather than upon the defendant corporation—the creature of the statute. But the Legislature saw fit to provide as they did, and we think the provision was within the scope of their constitutional authority.

There is nothing in the act which precludes the Legislature from exercising the power of eminent domain with respect to the boulevard or any part thereof at any time the public welfare, or the public necessity, in the judgment of the Legislature, should require it.

In *Nichols* on the *Power of Eminent Domain*, 395, § 325, it is said:

"A corporation which has taken land by eminent domain under legislative authority and devoted it to the public use has acquired no immunity from the condemnation of such property for some other public use which a subsequent Legislature may deem of greater importance."

The hands of the Legislature are not, therefore, absolutely tied for all time in respect to the road and its maintenance. Future Legislatures are not powerless, and the state is not deprived of its

Opinion.

soverign power, respecting the boulevard so long as exercise of the power of eminent domain is left free.

[25] The plaintiff not only attacks the constitutionality of the act, *Chapter* 189, *Volume* 26, of the *Laws of Delaware*, but has included in his petition, and accompanying affidavits, averments of fact *dehors* the record of the proceeding before Judge Conrad which is sought to be enjoined and prevented by the writ of prohibition prayed for.

The defendants contend that this court cannot hear or determine in this proceeding any such averments.

*Paragraph* 5 of *Section* 12 of *Article* 4 of the *Constitution* of this state confers upon the Supreme Court jurisdiction "to issue writs of prohibition   *   *   *   to the Superior Court, the Court of Oyer and Terminer, the Court of General Sessions, the Court of Chancery and the Orphans' Court, or any of the judges of the said courts, and all orders, rules and processes proper to give effect to the same." By such provision this court is given original jurisdiction to issue writs of prohibition; and this is the first case in which the exercise of such jurisdiction has been invoked.

The writ of prohibition is a common-law writ. It issues only from a superior court to an inferior court, tribunal or judge, and only for the purpose of keeping such inferior court within the limits of its jurisdiction. That is the sole purpose of the writ.

The common-law procedure included a method, and also the means, of determining issues of fact *dehors* the record in prohibition cases; but the court of last resort in England, corresponding to this court, did not have original jurisdiction to issue writs of prohibition.

No common-law practice or procedure could govern the Supreme Court of this state in the exercise of such original jurisdiction; and no procedure has been established in this state, either by statute or decisions, applicable to the subject.

While this court is given by the Constitution the right to make all orders, rules and processes proper to give effect to its writs of prohibition, it is not thereby given the power or means of trying issues of fact *dehors* the record. It can have no jury, neither has it the authority to appoint commissioners, masters

or other officers or agents to take testimony, examine questions of fact and report their findings to the court. In other words, this court has no machinery for the determination of issues of fact outside the record.

The case of *Ex parte Easton*, 95 *U. S.* 68, 24 *L. Ed.* 373, seems to be particularly in point, and we quote from the opinion the following:

"Application for the writ of prohibition is properly made in such a case, upon the ground that the District Court has transcended its jurisdiction in entertaining the described proceeding; and whether it has or not must depend, not upon facts stated *dehors* the record, but upon those stated in the record upon which the District Court is called to act, and by which alone it can regulate its judgment. Mere matters of defense, whether going to oust the jurisdiction of the court or to establish the want of merits in the libelant's case, cannot be admitted under such a petition here to displace the right of the District Court to entertain suits; the rule being that every such matter should be propounded by suitable pleadings as a defense for the consideration of the court, and to be supported by competent proofs, provided the case is one within the jurisdiction of the District Court."

It may be true that the plaintiff could not present to Judge Conrad the facts outside the record which he asks this court to consider; but that cannot give to the Supreme Court a power which is not conferred by the Constitution or statute, and which said court does not inherently possess.

We are clearly of the opinion that this court has not the power to hear and determine the issues of fact raised by the petition, answer and accompanying affidavits, which are *dehors* the record.

But even if the court had the right, and also the means, of determining issues of fact *dehors* the record, it would be entirely unnecessary to do so in the present case.

The plaintiff contends that every condemnation proceeding involves the question of the necessity of taking the particular land desired, and that this question is a judicial one. This particular question, the plaintiff insists, was raised before Judge Conrad, and is again raised in the petition for the writ of prohi-

bition; and the denial of such necessity is supported by the affidavits of the plaintiff and six other persons, filed with the petition.

The defendants claim that the charge which the plaintiff makes in his averments of fact *dehors* the record is in substance and effect but an attack upon the good faith of Coleman du Pont Road, Incorporated.

We will not undertake to decide what is the real purpose of the plaintiff in making such averments of fact, but will assume that the purpose was, as he declares, to show that the taking of the land was not necessary.

We have already decided that the purpose for which the statute authorizes a strip of land two hundred feet in width to be taken is a public use. It follows, therefore, that the purpose for which the land of the plaintiff is sought to be taken is a public one.

We have also decided that, when the court is satisfied that the land taken by the exercise of the power of eminent domain is taken for a public use, the question of necessity is for the Legislature and not for the court to determine, and that when the Legislature has, in the exercise of an honest discretion, determined that question the court should not and will not interfere.

Such being our view of the law it would be entirely unnecessary and profitless for this court to determine, or undertake to determine, by facts outside the record, the question of the necessity of the taking of the particular land desired, viz., the land of the plaintiff.

[26] Upon the questions above considered and determined the court is unanimous. Upon the remaining question, viz., the constitutional passage of the act in question, the majority of the court are of the opinion that the act was constitutionally passed, but for different reasons.

I am of the opinion that the act in question was constitutionally passed, and is a valid act under the journal entry doctrine. Under such doctrine every legal presumption is to be made in favor of the validity of the act. If the journal entries fail to show that the enrolled act was not the act that was in fact passed, or if the journal entries are such as to make it doubtful which one of

two acts was passed, then the presumption in favor of the enrolled and published act stands, and the same must be held valid.

The court in the *Rash-Allen case, ante*, 76 *Atl.* 370, clearly recognized the fact that the "journal entry respecting the title of the bill upon which the yea and nay vote was taken might be a mistake, and the true and correct title that of the substitute bill."

The court in that case said:

"Of course it is possible that it may sometimes appear from the journals themselves that a mistake was made therein respecting the title of the bill on the final vote, and that the bill actually passed was another bill, with an entirely different title. But we are clearly of the opinion that in the present case the journals not only do not show that such was the fact, but they leave no room for doubt."

It also appears from the *Rash-Allen case* that, when there is a contention as to which one of two bills was in fact passed, the court "will examine, not only the entry respecting the final passage of the bill, but all the pertinent journal entries in order to determine which bill was passed. One of such entries," said the court, "is the title of the bill, a similarity of title indicating that a mistake might have been made by the clerk."

The court in that case, after a most careful examination of all the journal entries, concluded that no mistake was made, and that the original Senate bill, and not the substitute, was passed, holding that, "It therefore affirmatively and indisputably appears from the journals of each house that the yea and nay vote was taken upon a bill which bore an entirely different title from that of the bill which the contestants claim was passed."

It would require entirely too much time and space to specifically compare the journal entries in the present case with those in the *Rash-Allen case*. It will be enough to say that in the latter case there was no such similarity of title between the original and substitute bill as might cause a clerical mistake, as there is in the present case. The probability of such a mistake being made where the titles are very similar was distinctly recognized in the *Rash-Allen case*.

In that case it was expressly noted as a very significant fact

that the journals showed that the original bill was the one upon which the yea and nay vote was taken in *each house*. The court said: "If the title of the original bill was read by mistake, or inadvertently written, for the title of the substitute, is it not most remarkable that the same mistake should have been made in each house of the General Assembly?"

And the court further said:

"If the substitute bill was the one that was in fact passed, is it not equally remarkable that nothing whatever was done with it in the Senate, so far as the journal shows, after it was reported by the committee, until it was enrolled, and that in the House, so far as the journal of that body shows, it was not presented, read, reported by the committee, or acted upon at all, no mention being made of it there until it was enrolled."

It is true that in the present case the original and substitute bill bore the same number, as they did in the *Rash-Allen case;* but in the latter case the court said there might be some significance in that fact "if the similarity in the number proved the similarity in the character of the bills. But we know that the two bills were essentially different in character."

The court in the *Rash-Allen case*, after a most careful examination of *all the journal entries*, concluded that no mistake was made, and that the original Senate bill, and not the substitute, was passed.

The question now is, whether in the present case the journal entries clearly and satisfactorily show that it was the original and not the substitute bill that was passed. If they do not, or if they leave it doubtful in the mind of the court, which one of the two was passed, the enrolled and published act stands unimpeached.

What do the journal entries show?

Generally speaking, they show a very different state of facts from the *Rash-Allen case*—because:

1. There is but one entry in the House Journal which indicates that the original bill was passed, and that is the entry which states that the Secretary of the Senate informed the House that the Senate had passed the original bill and requested the con-

currence of the House therein. Every other entry shows that the substitute bill, that is, the enrolled and published act, was constitutionally passed.

There is but one entry in the Senate Journal which indicates that the original bill was passed by that body, and that is the entry respecting the yea and nay vote. Of course, this is the most important and vital entry respecting the constitutional passage of a bill, under the journal entry doctrine. But, as we have seen, the court may notwithstanding this fact be satisfied, after a careful examination of all the journal entries of both houses, that there was a clerical error made in the title, on the final passage of the bill, and that it was another bill that was in fact passed. And such clerical error is more likely to be made if there is a striking similarity in the titles of the two bills.

2. The *substitute bill* was reported favorably by the Senate committee, and immediately, or at least before any other business intervened, a bill was passed of practically the same title, but called the original Senate bill. The passage of the bill followed right upon the report of the committee, and it is most natural to believe that it was the reported bill that was passed, and that the title of the original was entered by mistake. There are no other entries in the Senate Journal that are inconsistent with the passage of the substitute bill; indeed every other entry in the Senate Journal, and, as we have said, every entry but one in the House Journal, indicates that this was the bill that was passed.

3. The original and substitute bill bore titles that were strikingly similar, and such as were not unlikely to cause confusion and mistake. The only difference in fact was in the parenthetical words contained in the brackets, and even those words meant one and the same thing. There was no real difference in the titles.

4. In the *Rash-Allen case* there were certainly two separate and distinct bills, differing not only in title but also in subject-matter. It is not at all certain that there was, at the time the yea and nay vote was taken in the Senate, more than one bill relating to the organization of boulevard corporations, which was the real title of both the original and substitute bill.

5. The entry indicating that it was the original bill that received the yea and nay vote is in the journal of one house only; and while the journal of the House states that the Secretary of the Senate informed the House that the Senate had passed and requested the concurrence of the House in the original bill, the House later informed the Senate that it had concurred in the substitute. There was but one bill sent by the Senate to the House, the title of which referred to boulevards.

In considering the question now before the court there are two propositions of law that should be kept in mind:

1. The court will presume every enactment of the Legislature to be constitutional, and the burden is upon him who challenges its constitutionality, to show it.

2. The journal entry doctrine holds that the enrolled act, duly authenticated and published, is *prima facie* evidence of its validity and raises a strong presumption of its constitutional passage. This presumption prevails, and the statute must be sustained, unless the journals show clearly and satisfactorily that the statute was not constitutionally passed. If the journals leave any doubt upon this subject the presumption remains and the statute is sustained.

After considering the journals of the two houses I think the presumption of the constitutionality of the act in question is not rebutted or overthrown, because the journal entries, taken as a whole, do not convince me that any constitutional prerequisite was not complied with in the passage of the act. On the contrary, they lead me to believe that the two entries mentioning the original bill were clerical mistakes, the subject-matter being the substitute bill, and such bill being clearly meant or intended.

From the foregoing statement of facts showing the legislative history of the bill under consideration it is manifest that the present case is clearly distinguishable from the *Rash-Allen case* in which the journal entry doctrine was recognized. Under such doctrine, I hold the act now in question to have been constitutionally passed.

RICE, J.:—One question in this case for the determination of the court is whether the provisions of *Section* 10 of *Article* 2 of the *Constitution* of the State of Delaware have been complied with by the General Assembly in the passage of the Boulevard Act?

This question involves the consideration of two doctrines known as the "journal entry doctrine" and the "enrolled act doctrine."

In a comparatively recent case in this state the five law judges, sitting at that time, and constituting a court in banc, passed upon the merits of the two doctrines, after a thorough and exhaustive argument by counsel in that case.

The majority of that court accepted and applied as the law in this state the "journal entry doctrine," and the minority dissented and expressed their opinion in favor of the "enrolled act doctrine."

In the present case it appears to me that it is not necessary for me to pass upon the merits of the respective doctrines for the following reasons: (1) That the law pertaining to the two doctrines as applicable in this state was not argued to any extent by counsel on either side; (2) that the present case is distinguishable from the former case.

I therefore concur in the whole opinion as read by the Chief Justice.

WOOLLEY, J.:—In the *Rash-Allen case* and in this case, Judge Boyce and I have concurred in our opinion of the law respecting the valid enactment of statutes under our constitutional provision, and at his request I will briefly embody his views with mine.

Sitting as judges of the Supreme Court in the consideration of this case, we do not here feel bound by the doctrine announced by the majority of the court in banc in the *Rash-Allen case;* but, on the contrary, we consider that in this court we may express our views and state our positions relative to the law by which the valid enactment of statutes in this state is to be tested and determined, freely and without the restraint of precedent.

In order therefore to make certain our positions upon this question, we state that we cannot subscribe to the journal entry

doctrine announced by the majority of the court in the *Rash-Allen case*, nor to that doctrine as applied to this case, nor can we distinguish this case from the *Rash-Allen case*, for to our minds the journal which is relied upon in this case as the constitutional record of the Legislature's acts discloses precisely the same journal defect that was held to justify the decision in the *Rash-Allen case*.

Giving, however, to our constitutional provision the interpretation made by the minority of the court below in the case of *Rash v. Allen*, and adhering to the enrolled act doctrine as stated in the opinion of the minority of the court in that case, we hold that by the force of that doctrine, and according to the principles it embodies, the statute put in question in this case was validly and constitutionally enacted.

CURTIS, Ch.:—The petitioner urges as one ground against the right to take his land the failure of the Legislature to comply with the constitutional requirements for the validity of the passage of the act under which the corporation seeking to take his land was incorporated. In the argument of this point counsel referred only to the case of *Rash v. Allen*. .For the petitioner, it was urged that, applying the principles of that case, the act was not validly enacted; and for the defendants, that the two cases can be distinguished, and, further, that the act was validly enacted, whether the doctrine adopted in that case by the court, or that advocated in the dissenting opinion, be applied here.

The case of *Rash v. Allen* was heard by the five law judges sitting as a court in banc (and not including the Chancellor, who is never a member of that court), to determine a cause then pending in the Superior Court, and there three members of it adopted and applied the doctrine of construction known as the "journal entry doctrine," and the other two joined in adopting and applying the other doctrine of construction known as the "enrolled act doctrine," it being necessary in that case to determine whether an act had been validly enacted.

In this present case a majority of the court here finds that the act in question was validly enacted, though for divers and diver-

gent reasons.   Two members of this court, who were members of the Court in Banc, adhere to the doctrine of the minority of the court in that case, and, applying the enrolled act doctrine, find that the act was passed according to the Constitution, while one other member of this court, who was also a member of the court in the case cited, while adhering to the journal entry doctrine, distinguishes the two cases and reaches the same conclusion in favor of the act.    In other words, in the present case the majority of this court reach the same conclusion for different reasons.

At this time I am not prepared to adopt either of these doctrines in preference to the other.    The general question was not argued by counsel in this case, and all of them referred only to the case of *Rash v. Allen* and the learned and exhaustive opinions there delivered.

A judgment of the Court in Banc is not binding upon the Supreme Court, for an appeal will lie from the latter to the former. Nor would the principles of law adopted by the former be controlling in the latter court in the same or other cases.   Great respect should be, and has been, given by the members of the Supreme Court to the opinions of the judges constituting the Court in Banc, especially when the opinions in the latter court agree.   Under the circumstances, I do not feel controlled by the views expressed in the case of *Rash v. Allen* as to the rules of constitutional interpretation.    The constitutional question there raised was of great importance, involving, as it does, the rules to be applied in determining whether acts of the General Assembly passed since 1897 meet the requirements of the Constitution as to the procedure for the enactment of laws.    It is very important, too, that it should be settled in this the Supreme Court of the state which of the rules of construction should be adopted in Delaware, and I regret very much that I am unable, at this time, to do my part by expressing my own opinion on the subject in this present case.   But in view of the magnitude of the question, the extensive study required and the limited time available for consideration of this question, in addition to the several other difficult questions raised and learnedly discussed in this case, I have not as yet been able to reach

conclusions satisfactory to myself, or to give to the matter the deliberation which its importance deserves.

Inasmuch as a majority of this court have reached conclusions which will determine the judgment to be rendered in this case, I feel that the rendering of the decision should not be delayed. But I reserve to myself at least an opportunity to file, at or before the next regular term, an opinion on this branch of the case, inasmuch as the conclusions I may reach, whatever they may be, will not affect the rights of the parties in this present cause.

For Judge Boyce and myself I am constrained to say, and it seems only just to ourselves that we should say, that we have had perplexing doubts, fully known to the members of the court, as to the constitutionality of the act of Assembly which we have had under consideration, in several respects.

In concurring with the opinion of the court first read by the Chief Justice, in so far as it is the unanimous opinion of the court, we have, as it is our duty to do, when it can be done, not without considerable hesitation, resolved our doubts in favor of the validity of the act as expressed in the opinion.

The rule is discharged, petition dismissed and petitioners ordered to pay the costs.